## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

     Plaintiff,

and

**CRYSTAL VINSON and BREANNA
CALDWELL,**

     Plaintiff-Intervenors,

v.

**MEDIACOM COMMUNICATIONS
CORPORATION, a New York
Corporation,**

     Defendant.

Civil Action No. 7:18-CV-166 (HL)

## ORDER

The Equal Employment Opportunity Commission ("EEOC") filed this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and Title I of the Civil Rights Act of 1991 ("Title I") to correct Defendant Mediacom Communications Corporation's ("Mediacom") alleged unlawful employment practices on the basis of sex and to provide relief to Crystal Vinson, Breanna Caldwell, and Heather Vaughn.[1] In their Complaint in Intervention, Plaintiff-

---

[1] The EEOC's Complaint alleges that Crystal Vinson, Breanna Caldwell, and a class of female employees were adversely affected by Mediacom's alleged

Intervenors Vinson and Caldwell claim that they are entitled to relief under Title VII and Title I for Mediacom's alleged acts of sexual harassment and retaliation. Plaintiff-Intervenor Vinson asserts a separate claim for constructive discharge.

Now before the Court is Defendant's Motion for Summary Judgment (Doc. 30). Mediacom argues that Plaintiffs have not produced evidence of actionable sexual harassment or retaliation. After reviewing the pleadings, briefs, and other evidentiary materials presented, the Court concludes that material questions of fact remain that must be resolved by a jury. Mediacom's Motion for Summary Judgment (Doc. 30) is **DENIED**.

I.    **BACKGROUND**

Mediacom is a New York-based telecommunications company that provides high-speed internet service as well as television, video, home security, and other telecommunications products. (Hudson Dep., p. 32). Mediacom maintains multiple call centers, including one in Valdosta, Georgia. (Roberts Dep., p. 17). Call center employees field telephone calls from customers "with service issues or possibly requesting new services from Mediacom, and they

---

unlawful employment practices. (Doc. 1). Through discovery, the EEOC identified three class members: Vinson, Caldwell, and Vaughn. (Doc. 44, p. 1 n.1). For the sake of clarity, throughout this Order the Court will refer to the EEOC and the three purported class members, two of whom are also intervenors in this case, collectively as "Plaintiffs."

troubleshoot if it's a service issue or if [customers] are wanting new services."
(Hudson Dep., p. 21).

All customer service representatives for Mediacom work in one large room
that is divided into individual cubicles, or workstations. (Hudson Dep., p. 17;
Vinson Dep., p. 41-42). Partitions separate the computers for each workstation
but do not otherwise create a physical barrier between employees. (Caldwell
Dep., p. 23; Vinson Dep., p. 42). Payne Roberts, the Senior Manager for
Mediacom's Columbus and Valdosta, Georgia and Dagsboro, Delaware call
centers, is responsible for the call center seating chart. (Roberts Dep., p. 17-18,
72, 82). Typically, employees only move seats following a "shift bid." (Id. at p.
72). Shift bids, which occur every six months, allow employees to vie for different
shift schedules and are based on employee performance. (Roberts Dep., p. 85;
Vaughn Dep., p. 22).

Customer service representatives in the Valdosta call center are assigned
to one of four supervisors: John Lewis, Love Fernandez, Tina Lale, or Aaron
Greenberg. (Roberts Dep., p. 12, 19). Supervisors are responsible for coaching
and developing customer service representatives, which includes "monitor[ing]
their calls, mak[ing] sure they're doing the right things on the phone with
customers, [and] giv[ing] feedback." (Roberts Dep., p. 20). Supervisors report to
Payne Roberts. (Id.). There are also three shift leaders, or "leads": David

Getchell, Antionette Brown, and Michael Harvey. Leads are not considered supervisors. (Long Dep., p. 38). When an employee needs help with a call, "their first line of defense is to go to the lead to help resolve a customer's issues. If the lead can't help them or is not available, then they go to the supervisor." (Long Dep., p. 178; see also Hudson Dep., p. 22). Employees may seek assistance from any available lead or supervisor, but typically, they will go to the individual closest to their workstation. (Hudson Dep., p. 19; Roberts Dep., p. 69).

Mediacom maintains an Equal Employment and Anti-Harassment Policy that applies to all Mediacom employees. (Doc. 42, p. 5). The policy provides that its purpose "is not to regulate our employees' personal morality or conduct. Rather, it is to insure that in the workplace, no one unlawfully harasses another individual." (Id.). The policy defines sexual harassment as "unwanted sexual advances, requests for sexual favors[,] or visual, verbal or physical conduct of a sexual nature when . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an employee's work performance *or* creating an intimidating, hostile or offensive working environment." (Id.) (emphasis in original).

The anti-harassment policy provides specific procedures for reporting harassment:

> If an employee believes he or she has been subjected to any form of discrimination, harassment or retaliation in violation of this policy, or if the employee is aware of an incident of discrimination, harassment or retaliation involving another individual, the employee should

4

provide a written or verbal report to the local Human Resources department, the employee's supervisor, or department head. Alternatively, the employee may report the matter to [the] Executive Vice President of Programming and Human Resources or the Corporate Vice President of Human Resources.

(Id. at p. 7). "All complaints received by supervisors and/or department heads are to be immediately reported to Human Resources." (Id.). The policy further directs supervisors to report any conduct that may be perceived as harassment "whether or not a complaint has been registered to him/her." (Id.).

Violation of Mediacom's anti-harassment policy may result in disciplinary action, up to and including immediate discharge. (Id.). Additionally, "[d]isciplinary action may be taken when an investigation reveals conduct on the part of an employee that does not rise to the level of unlawful discrimination or retaliation[ ] but is nevertheless inappropriate." (Id.). Mediacom will inform the harassed person "that action has been taken[ ] but will not necessarily . . . inform[ ] [her] of the specifics." (Id. at p. 8). The policy directs the harassed individual to report any continuing harassment "so that further remedial action can be taken if necessary." (Id.).

**Crystal Vinson**

Mediacom hired Plaintiff-Intervenor Crystal Vinson as a customer service representative in February 2016. (Vinson Dep., p. 28, 30). However, she did not start working for the company until May 2016 when the next training class began.

5

(Id. at p. 28). Training lasted from May through August. (Id. at p. 34). Vinson next spent two weeks on the call center floor training with another representative. (Id.). Vinson then was assigned to a workstation under the supervision of John Lewis. (Id. at p. 35).

About a week into Vinson's regular employment, Mediacom moved customer service representative Marcus Christian to the cubicle immediately next to Vinson's. (Id. at p. 50).[2] Their chairs were positioned less than two feet apart. (Id. at p. 56). Vinson had not interacted with Christian prior to this time. (Id. at p. 50). Initially, she engaged in friendly conversation with Christian about work and, occasionally, about their children. (Id. at p. 50-51). One Saturday, Vinson was assigned to work a pay-per-view event for Mediacom. (Id. at p. 164). She could not work the event due to a family obligation, so she asked Christian if he would work the event for her with the understanding that she would cover his next pay-per-view assignment. (Id.). When Vinson returned to work the following Monday, Christian "said that [she] had to wear a skirt for him working" the event for her. (Id. at p. 165). Their mutual supervisor, John Lewis, overheard the comment and chastised Christian saying, "you can't talk to her like that, man." (Id.). The two men then "laughed it off." (Id.).

---

[2] Christian had been working for Mediacom since August 2015. (Christian Dep., p. 17). John Lewis was his supervisor throughout the entirety of his employment. (Id. at p. 151).

All conversation between Vinson and Christian stopped when in mid to late September Christian began touching Vinson. (Id. at p. 52). According to Vinson, "he would touch me through the back of my chair. The chairs that we sat in had an opening right here at the lower back part of it, and he would scoot his chair close to my desk and touch me on the back bottom side of my bottom." (Id. at p. 53). Over the next week and a half, Christian touched Vinson in this fashion three to five times. (Id. at p. 54). Christian never said anything when he touched her. (Id. at p. 55). When Vinson told him to stop, Christian "just smirked, like grinned." (Id. at p. 55). After one incidence of Christian touching her, Vinson slammed her hands on her desk and scooted her chair away from him. (Id. at p. 54-55). John Lewis asked her if she was okay. (Id. at p. 55). Vinson "told him, no, [she] needed to talk with him." (Id.). Lewis told her that he needed to finish a supervisor call and then they would talk. (Id.). He never addressed the situation with her again. (Id.). Vinson attempted to speak with Lewis about Christian touching her on at least three occasions. (Id. at p. 188). Each time, Lewis indicated that he did not have time to talk to her. (Id.). Vinson testified that Lewis confirmed seeing Christian touching her; however, Lewis denies observing Christian touching Vinson or Vinson reporting any misconduct by Christian. (Lewis Dep., p. 21-22; Vinson Dep., p. 168-69).

7

Vinson and Christian were working together on Saturday, October 8, 2016, when Christian again attempted to touch her through the back of her chair. (Vinson Dep., p. 60-61). Vinson moved her chair as far away from him as possible. (Id. at p. 61). Christian then removed his penis from his pants and "tried to grab [her] hand towards it." (Id.). When Christian grabbed Vinson's wrist, she looked over and saw his exposed penis. (Id. at p. 62). Vinson snatched her hand away, stood up, removed her headset, and went outside the building. (Id.). Once outside, she immediately called John Lewis, who was not scheduled to work that day. (Id. at p. 63; Lewis Dep., p. 23). Vinson told Lewis that Christian "had just pulled his penis out of his pants and tried to grab [her] hand and have [her] touch it." (Vinson Dep., p. 63). Lewis responded, "You have got to be kidding me." (Id.).

Lewis contacted Tina Lale and Aaron Greenberg, the two supervisors on duty. (Lewis Dep., p. 23). Aaron Greenberg then notified Payne Roberts, who called Sonja Hudson, the Senior Director for Human Resources. (Roberts Dep., p. 46). When Vinson returned to the call center, she went to the bathroom to wash her face and to compose herself. (Vinson Dep., p. 64). Tina Lale met Vinson either in the bathroom or in the hallway outside the bathroom. (Lale Dep., p. 49-50; Vinson Dep., p. 64). Lale indicated to Vinson that she was aware of what happened with Christian. (Lale Dep., p. 53; Vinson Dep., p. 64). Lale

testified that Vinson was not crying and did not appear to be visibly upset but that Vinson "had said that she was just maybe a little frazzled." (Lale Dep., p. 53).

Vinson told Lale that she did not want to draw attention to the situation. (Lale Dep., p. 54). Lale instructed Vinson to return to her desk and to act as though she was having issues with her computer. (Lale Dep., p. 54; Vinson Dep., p. 66). Lale then told Vinson to move to a workstation near Lale. (Id.). When Vinson returned to her workstation, Christian was at his desk. (Vinson Dep., p. 66). Vinson shut down her computer. (Id. at p. 67). Christian "kept asking [her] what was wrong, what happened, what [she] was doing, why [she] was moving." (Id.). She said nothing in response. (Id.).

Sonja Hudson, who works primarily from Mediacom's Gulf Breeze, Florida office, called the office to speak with Vinson. (Hudson Dep., p. 11, 49). Vinson reported to Hudson that Christian exposed himself to her. (Id. at p. 49). According to Hudson, Vinson denied any touching occurred. (Id.). However, Vinson attests that Hudson never asked whether Christian touched her, and she never denied that he did. (Vinson Aff., ¶ 8). Hudson, noting that Vinson was upset, told Vinson to go home for the day. (Hudson Dep., p. 50).[3]

---

[3] Vinson states that Tina Lale told her to go home for the day, not Hudson. (Vinson Aff., ¶ 10). Who provided permission for Vinson's early departure is not material to the resolution of the pending motion.

Hudson then spoke with Christian. (Id.). Hudson asked Christian, "What's going on between you and Crystal." (Christian Dep., p. 61). She also asked him whether he exposed himself. (Id.). Christian did not understand what Hudson was asking him. (Christian Dep., p. 61; Hudson Dep., p. 50). Christian asked, "What do you mean by 'expose'?" (Christian Dep., p. 61). Christian testified that "they were kind of like silent," and he "was kind of like, 'Okay. No, I didn't.'" (Id.). He initially thought he was being asked about something he said. (Id. at p. 160). Once he understood that he was being asked whether he exposed his genitals, Christian denied the allegation. (Id.). He also left work early. (Christian Dep., p. 63; Hudson Dep., p. 50).

When Vinson returned to work the following Monday, the call center employees all seemed to know what happened over the weekend between Vinson and Christian. (Vinson Dep., p. 70-71). A female customer service representative named Michelle told Vinson that "it wasn't the first time it had happened" and that Christian previously had been reported for the same conduct. (Id. at p. 70, 72). According to this woman, another female employee reported Christian for touching and harassment, and, when nothing was done, she resigned. (Id. at p. 72). Adriane Thomas, a female customer service agent, told Vinson "[t]hat it happened with multiple females and that Mediacom was never going to do anything about it." (Id. at p. 73). The general rumor was that

Christian would stare at a white girl from each training class. (Id. at p. 170-71; Lale Dep., p. 102).

Sonja Hudson, Payne Roberts, Carla Long, a Senior Human Resources Manager, and Donna Watkins, a Human Resources Supervisor, met with Vinson the week following the exposure incident. (Hudson Dep., p. 50; Long Dep., p. 64; Roberts Dep., p. 47-48; Watkins Dep., p. 42). Vinson was assured that an Mediacom would investigate and take appropriate action. (Roberts Dep., p. 47-48). Payne Roberts asked Vinson what Mediacom could do to make her feel more comfortable. (Id. at p. 48). Vinson first said that she wanted Christian terminated. (Id. at p. 47). Roberts then asked, aside from firing Christian, what else could be done. (Id. at p. 48). Vinson asked to remain sitting near Tina Lale and requested a shift where more supervisors were present. (Id.).

Once Christian denied Vinson's allegations, the investigation terminated. (Hudson Dep., p. 50-51). Despite there being cameras in the call center, at that time they were not operational. (Vinson Dep., p. 78-79; Watkins Dep., p. 87). And no other employees in the vicinity of Vinson and Christian witnessed the alleged exposure. (Hudson Dep., p. 51; Vinson Dep., p. 58-59). On or about Friday, October 14, 2016, Mediacom informed Vinson "it was a he said, she said [situation], and nothing was going to be done about it." (Vinson Dep., p. 77-78). Mediacom took no disciplinary action against Christian. (Long Dep., p. 69). Sonja

Hudson expressed to him only that Mediacom took the allegations seriously, instructed him to have no further contact with Vinson, and emphasized that Mediacom does not tolerate any form of retaliation. (Hudson Dep., p. 54).

The following week, Mediacom modified Vinson's work schedule, assigning her to work Monday through Thursday, 10:30 a.m. until 7:30 p.m., and Saturdays from 10:00 a.m. until 7:00 p.m. (Roberts Decl., ¶ 6; Doc. 38-1, p. 69). This schedule still overlapped with Christian's schedule and did not resolve the problem of her working at times when supervisors were not on site. (Vinson Dep., p. 81; Doc. 38-1, p. 60).[4] At some point, Mediacom also moved Christian's seat assignment to place him closer to a supervisor. (Doc. 38-1, p. 60).[5] In his new seat assignment, Christian faced outward toward the center of the call center. (Roberts Dep., p. 71). This arrangement caused Vinson to become uncomfortable approaching the supervisor. (Doc. 38-1, p. 60). Vinson felt as though she was being punished for reporting harassment. (Vinson Dep., p. 85).

---

[4] Christian worked part-time Monday, Tuesday, Wednesday, and Friday from 3:00 p.m. until 9:30 p.m. and Saturday from 1:00 p.m. until 7:30 p.m. (Roberts Decl., ¶ 9). On May 24, 2017, his scheduled changed to 4:30 p.m. until 9:30 p.m. during the week and 2:00 p.m. until 7:00 p.m. on Saturdays. (Id. at ¶ 10).

[5] The timing of moving Christian's seat is not clear from the record. There is evidence that Mediacom moved Christian in December 2016 after he complained about another male turning toward him. (Christian Dep., p. 82; Doc. 38-1, p. 78). The move appears to have been in response to Christian's own complaint and not in relation to Vinson's harassment allegations.

Even though Mediacom moved her seat, Vinson remained uncomfortable. (Vinson Dep., p. 84).[6] She explained, "I was still in the building with Marcus. He could still see me where he would sit and he could still get to me, so I still was not comfortable." (Id.). On October 20, 2015, Vinson e-mailed Italia Commisso, Mediacom's highest ranking human resources official. (Doc. 35-1, p. 8). Vinson provided Commisso with a brief synopsis of the preceding weeks and expressed her feeling that she "was the one being punished for something that I had no control over[,] and [Christian] got off with nothing at all." (Id.). Vinson further informed Commisso that prior to the exposure incident she tried to inform her supervisor about her issue with Christian, "but the supervisors here are very busy." (Id.). She asked Commisso what else could be done to address the situation, telling her, "I just want to feel comfortable . . . again." (Id.).

As a result of Vinson's e-mail to Commisso, Mediacom again changed her work schedule. (Vinson Dep., p. 88). Her new schedule was Monday through Friday, 8:00 a.m. until 5:00 p.m. (Roberts Decl., ¶ 7; Doc. 38-1, p. 70). The change eliminated any overlap between Vinson and Christian on Saturdays. But,

---

[6] Sonja Hudson acknowledges that moving Vinson's seat assignment was not the proper response. (Hudson Dep., p. 70). She testified that she understood "what they were trying to do, but they went about it the wrong way." (Id.). She further recognizes why Vinson felt as though Christian should have been moved instead and agrees that "[i]t should have been him." (Id. at p. 64). Additionally, according to Payne Roberts, it is "[s]uper uncommon to just move somebody." (Roberts Dep., p. 72).

because Christian reported to work at 3:00 p.m. during the week, they were still in the building together for several hours each day. (Vinson Dep., p. 88). While unhappy with the outcome of the investigation, Vinson accepted the schedule change, stating, "I had to . . . if I wanted to keep my job." (Id.; Doc. 38-1, p. 59).

For several weeks, Vinson was fine. (Vinson Dep., p. 91-92). Then Christian started coming to the area where Vinson was seated to ask questions of Tina Lale. (Id. at p. 90). Lale told Vinson that before Vinson moved, Christian never asked her anything. (Id. at p. 90, 92). Vinson further testified that when Christian walked by her seat, he "would rub his arm against the back of my chair." (Id. at p. 90). He "would touch [her] on [her] shoulder or the same bottom part he touched" her previously. (Id. at p. 91). Vinson believes that Lale witnessed the touching and understood that Lale reported it to Donna Watkins. (Id.). Crystal did not make a specific report to Lale because Lale personally observed the touching and said that she would report it. (Id. at p. 93). After Lale said that she would report the problem, the touching stopped. (Id. at p. 94). Around this same time, Vinson learned that another female customer service representative, Heather Vaughn, reported Christian for harassing conduct. (Id. at p. 95).

Christian touched Vinson once again in January 2017. (Id. at p. 100). As Vinson was walking down the hallway, Christian, who was walking toward her,

"moved so that he could walk right into [her] and touch [her] breast." (<u>Id.</u> at p. 100-01). Vinson testified, "[H]e literally moved to my side of the hallway and walked right into me and stood there with his hand on my breast." (<u>Id.</u> at p. 102). Vinson pushed him away and immediately ran to Tina Lale. (<u>Id.</u>). Lale said she would report the incident to Donna Watkins. (<u>Id.</u>). Vinson heard nothing further from Mediacom concerning the January touching until the internal investigators came in May 2017. (<u>Id.</u>).

Vinson testified that Christian stared at her daily: "Just looking at me from where he was sitting, staring at me." (<u>Id.</u> at p. 104). She stated that she would try to hide in her cubicle. (<u>Id.</u>). But he would still stand up at his desk to stare at her. (<u>Id.</u> at p. 105). John Lewis told her that he witnessed Christian staring at her numerous times. (<u>Id.</u> at p. 159). However, according to Adriane Thomas, Lewis also commented to several other employees that "he would do whatever he needed to do to protect his boy." (<u>Id.</u> at p. 152). Vinson believed that Lewis excused Christian's behavior. (<u>Id.</u> at p. 159). Several of Vinson's friends in the call center also told her that Christian had taken a screenshot of her Facebook profile picture and was showing the picture to others. (<u>Id.</u> at p. 156). Vinson was not Facebook friends with Christian. (<u>Id.</u>).

Vinson and her husband divorced in June 2017. (<u>Id.</u> at p. 192). Her experience at Mediacom contributed to the demise of her relationship. (<u>Id.</u> at p.

192-93). She testified that her experience with Christian caused her to become emotionally and sexually detached from her spouse. (Id. at p. 193). She continues to deal with the emotional distress that began during her employment with Mediacom. (Id. at p. 196).

Heather Vaughn

Heather Vaughn began working for Mediacom as a customer service representative in March 2015. (Vaughn Dep., p. 12). Vaughn experienced no issues in her employment until late 2016 when Mediacom moved her to seat 2232 in the call center. (Id. at p. 23, 100). This workstation directly faced Marcus Christian. (Id. at p. 29). Within the first two days, Vaughn noticed Christian staring at her. (Id. at p. 24, 29). Christian's shift ended at 9:30 p.m.; Vaughn's ended at 10:00 p.m. (Id. at p. 24). The first night Vaughn noticed Christian staring at her, she notified her supervisor, John Lewis: "After Marcus got off, I let John know in a casual manner that he needed to talk to Marcus because I was uncomfortable because I could tell that he had been staring at me the entire day, and it made me uncomfortable and I didn't like it." (Id. at p. 25).  Lewis assured her that he would "take care of it." (Id. at p. 35).

Nothing changed after Vaughn made her initial complaint. (Id. at p. 36). Christian continued to stare. (Id.). According to Vaughn, "it was a known issue." (Id.). "Even if [she] didn't vocalize it every day, John [Lewis] was aware of it." (Id.

at p. 37). When Vaughn did speak with Lewis about the ongoing staring, Lewis replied that he "would send it up the ladder again." (Id.). Vaughn also spoke with Carla Long, who suggested that Vaughn take unpaid leave "while [Mediacom] figure[d] everything out." (Id. at p. 80). Vaughn found Long's offer "very disrespectful, that [she] would be the one that would take an unpaid leave off work instead of [Christian] while he's just working and not knowing anything is going on." (Id.).

Vaughn never saw anyone address Christian about his staring. (Id.). She also never spoke to Christian. (Id. at p. 89). While they were still working the night shift together, there were a few instances when Christian attempted small talk, but Vaughn "tried to make it very clear that [she] didn't want to have conversations with him." (Id.).

Vaughn testified that the staring was intentional and "aggressive", not "casual or nonchalant." (Id. at p. 34). "[F]rom the time he got in until the time he left, it was just [her] feeling his eyes on [her] in the most uncomfortable way that [she had] ever felt." (Id. at p. 26). She stated that she had never felt anything like it. (Id. at p. 26, 34). She said that he looked at her "like an animal looks at prey." (Id. at p. 112). There were times when "[h]e would be halfway out of his cubicle . . ., just very blatant, like here I am staring at you. Nobody's going to do anything about it." (Id. at p. 33). "[I]t was to the point to where it would take [her] over an

hour after [she] had gotten off of work to feel like he wasn't still staring at [her]." (Id. at p. 27).

For two or three months, Mediacom did nothing in response to Vaughn's complaints of Christian staring. (Id. at p. 39). Tina Lale emailed Payne Roberts on December 14, 2016, saying that Vaughn wanted to speak with either Roberts or Donna Watkins about moving Christian because "he sits back in his chair and stares at her the entire night and it makes her uncomfortable." (Doc. 38-1, p. 80). Roberts, who was in Columbus at the time, called Vaughn and discussed moving her seat. (Roberts Dep., p. 86; Vaughn Dep., p. 38; Doc. 38-1, p. 62). Moving Vaughn to a different workstation did not resolve the problem. (Roberts Dep., p. 87; Vaughn Dep., p. 41, 47).

After Mediacom relocated Vaughn, she "noticed that anytime [she] was out of [her] desk getting assistance from a lead or a supervisor," Christian would stand. (Vaughn Dep., p. 41). While other agents often stood at their desks, Vaughn had never before noticed Christian standing. (Id.). He would sit back down after she sat down. (Id.). Christian also started approaching lead David Getchell on a more frequent basis. (Id. at p. 47). Vaughn observed Christian coming to ask Getchell "just very basic questions that you could tell he was just trying to get out of his seat. And even David Getchell admitted that he noticed it.

18

Well, he was very aware of it and was trying to just rush [Christian] back to his seat." (Id.).

Vaughn then learned from her co-worker Adriane Thomas that Christian was moving his car beside hers at night. (Id. at p. 40). It was not uncommon for employees who worked later shifts to move their cars closer to the building entrance after the early shift employees left for the day. (Hudson Dep., p. 82). However, Christian appeared specifically to be moving his car to be closer to Vaughn. (Vaughn Dep., p. 40). Vaughn began taking pictures of Christian's car parked beside hers. (Id.). Vaughn testified that she grew increasingly uncomfortable because she was not sure what Christian was capable of doing: "He was someone that I couldn't gauge, and I'm usually a good read on people, but I couldn't—I couldn't tell. Like size wise, you wouldn't look at him and think anything of him, but I wouldn't feel safe with him alone in a room." (Id. at p. 40-41).

One night Christian followed her out to the parking lot, but when Christian saw Vaughn's boyfriend, who was wearing his police uniform, Christian "immediately darted and hid in his truck for about ten minutes." (Id. at p. 43). Vaughn reported the incident to John Lewis, whose response was to pat another female employee on the shoulder and say as "long as it's not my girl, it'll be okay." (Id. at p. 110-11). Vaughn found Lewis' remark inappropriate and stopped

discussing anything with him. (Id. at p. 111). Christian followed Vaughn to the parking lot on at least five other occasions. (Id. at p. 85, 103). It was during this time that after approaching Getchell with a question Christian then commented to Vaughn about her shirt looking good on her. (Id. at p. 79). Vaughn became very emotional: "I just lost it. I just started crying, and I went into Payne's office. It was in the afternoon, and I was just like I can't be here when he's here. I need to go home. I can't deal with this anymore." (Id.). She took unpaid leave for the remainder of the day. (Id. at p. 116).

On January 25, 2017, Vaughn emailed Payne Roberts to report the "on-going issue" with Christian. (Doc. 38-1, p. 81). Vaughn wrote that after moving because of a computer issue, several people alerted her to Christian looking at her inappropriately. (Id.). She explained that since she "was out in the middle of the call center it apparently made more people aware." (Id.). Vaughn further raised the concern that Christian was moving his car next to hers late at night and emphasized that she was growing "more and more uncomfortable the longer it goes on." (Id.). Mediacom responded by moving Vaughn to yet another workstation. (Roberts Dep., p. 89). Christian was not aware of any of Vaughn's complaints. (Christian Dep., p. 80-81). He testified that he knew nothing about Vaughn's allegations of harassment until May 2018, when he met with the EEOC investigator. (Id. at p. 80).

Vaughn had the fewest issues with Christian while in seat 2223, but he continued to stand whenever she would leave her seat to talk to a lead or a supervisor. (Vaughn Dep., p. 55). Vaughn then moved to seat 2245 after a shift bid. (Id. at p. 58). At this point, Tina Lale became her supervisor. (Id.). Vaughn only had issues when she had to go to David Getchell's area for assistance. (Id.). Then, Christian "would either stand up or . . . he would move to the left to where he would be kind of halfway out [of his cubicle] and just sit and stare." (Id. at p. 59). Vaughn complained to Lale once or twice, but, ultimately, she "felt like there wasn't a point because . . . they weren't taking anything that [she], or anyone else, had been saying seriously, and nothing was being done, so [she] felt like [she] was just wasting [her] breath." (Id. at p. 59-60).

Vaughn provided a written statement at Mediacom's request in April 2017. (Doc. 38-1, p. 21). In her statement, Vaughn detailed how Christian stood up whenever she stood up, that he followed her to her car, and that he moved his car beside hers in the parking lot. (Id.). She stated that she tried to keep her distance and expressed her continued frustration that she was the one "having to go out of [her] way." (Id.). Sometime around April 26, 2017, Vaughn was standing in the middle of the call center talking to Love Fernandez when she noticed Christian staring at her. (Vaughn Dep., p. 36). Vaughn asked Fernandez if they could move. (Id.). Fernandez said that she would report the incident to Payne

Roberts. (Id.; Doc. 38-1, p. 17). Vaughn met with Roberts on April 28, 2017. (Doc. 38-1, p. 20). She again reported that Christian "only stands up when she stands up, and that he stares at her constantly, every time she leaves her seat." (Id.). When asked why she had not made Roberts aware of the ongoing issue, Vaughn replied that "she didn't see the point." (Id.). She told Roberts that Mediacom "can sit her anywhere in the call center [they] want, and as far away as possible, but that she will still have to get up to ask questions and he will stare at her." (Id.).

Christian's visual pursuit of Vaughn continued through March 2019 when he left Mediacom. (Christian Dep., p. 55; Vaughn Dep., p. 116). It was only then that Vaughn felt a weight lifted off her shoulders. (Vaughn Dep., p. 105). Before then, she cried often and tried to avoid Christian. (Id. at p. 76-77, 89; Doc. 38-1, p. 19). The only times she was comfortable at work were the days when Christian did not work. (Id. at p. 44). She used to say that Thursdays, the one weekday he was off, were her favorite day of the week. (Id.). She dressed more comfortably on those days. (Id.). When she knew Christian would be at work, Vaughn would not wear dresses or skirts. (Id.). Vaughn explained: "I just didn't know what he was capable of. He had never exhibited anything physical or anything of that nature, but you just don't know. You don't know anyone." (Id. at p. 89).

At the time of her deposition, Vaughn was still employed by Mediacom. She resigned on July 24, 2019, while this litigation was pending. (Roberts Dep., p. 159).  Vaughn testified that she remained at Mediacom because she needed the health insurance to address various medical problems. (Vaughn Dep., p. 60).

<u>Breanna Caldwell</u>

Plaintiff-Intervenor Breanna Caldwell's employment with Mediacom began in October 2016. (Caldwell Dep., p. 15, 25). She completed training from October through December 2016. (<u>Id.</u> at p. 22). Following training, Caldwell's shift assignment became 12:00 p.m. until 9:00 p.m. Monday, Tuesday, Thursday, and Friday and 10:00 a.m. until 7:00 p.m. on Saturday. (<u>Id.</u> at p. 20). John Lewis was her supervisor. (<u>Id.</u> at p. 30).

Caldwell experienced no issues in her employment until March 2017, when she "noticed a man staring at [her] in an odd manner that made [her] uncomfortable and standing up every time [she] stood up." (<u>Id.</u> at p. 37). She asked other employees in her work area whether they noticed the man staring at her. (<u>Id.</u>). Andrew Smith, another customer service representative, told Caldwell that she needed to report the matter immediately to Love Fernandez. (<u>Id.</u>). Karmeya Carter also confirmed that she saw the man staring at Caldwell. (<u>Id.</u> at p. 39). Caldwell had never met the man staring at her, nor at that point had she heard anything about Marcus Christian. (<u>Id.</u> at p. 37). Caldwell said that she

noticed the staring previously, but she "didn't know whether it was a one-time thing or if it was going to continue to go on. And as it continued to go on, that's when [she] said something." (Id. at p. 45). During her deposition, Caldwell struggled to articulate the nature of the staring. (Id. at p. 107). She testified definitively that that staring was "more than just innocent looking around" or "looking in [her] direction." (Id.). She explained, "Just the way that he looked I knew it wasn't in a friendly manner, it was meant in some sort of way." (Id.).

On March 11, 2017, Caldwell reported to Love Fernandez that the man, who she learned was Marcus Christian, was "positioning his chair specifically to stare at her" and that it was making her uncomfortable. (Doc. 38-1, p. 85; Caldwell Dep., p. 46, 48). Caldwell made the report on a Saturday, and Fernandez was the only supervisor on duty. (Caldwell Dep., p. 47). Fernandez told Caldwell that she was not the first person to report Christian for staring. (Id.). She then instructed Caldwell to return to her workstation and announce that she was having computer problems and Fernandez would move her to a different seat. (Id. at p. 48). Fernandez told Caldwell that the move would be temporary. (Id.).

Fernandez passed the complaint along to Payne Roberts, who said that she was "at a loss on what to do with another 'staring' allegation/issue." (Doc. 38-1, p. 85). Roberts also noted that "[w]ith or without moving his chair, where

[Christian] sits is in eye line of where [Caldwell] sits." (Id.). Ultimately, Roberts decided that Caldwell could be moved during the next shift bid in April. (Id.). Christian denies knowing who Caldwell is or staring at her at any time. (Christian Dep., p. 92, 94). He remembers only that her name was mentioned. (Id. at p. 94).

For the first few days after she was moved, the situation with Christian improved. (Caldwell Dep., p. 49). Christian then began standing up and staring at her again. (Id.). She explained, "Everywhere I went, he would stand up, even if I wasn't standing up, to look over the desk to see what I was doing." (Id.). When she turned around to ask her supervisor John Lewis a question, Christian "would have his chair moved and just be staring." (Id. at p. 40). When Christian saw her looking for a supervisor, if the supervisor "wasn't at his desk, [Christian] would smile at [her]." (Id.). On another occasion, Caldwell saw Christian sitting at David Getchell's desk, watching her while she finished a call. (Id. at p. 89). When she got off the phone, she started walking out of the building, and Christian followed her. (Id.). Caldwell did not feel safe. (Id.). She rushed to her car, got in, and immediately locked the doors. (Id.).

Caldwell soon began noticing Christian parking beside her in the parking lot. (Id. at p. 49). One day as she was leaving on her lunch break, Caldwell noticed Christian exiting his vehicle in a different area of the parking lot. (Id.). When she returned from her break, she deliberately parked in a different spot.

(Id. at p. 49-50). But when she left for the evening, Christian's car was parked next to hers. (Id. at p. 50). According to Caldwell, there were "plenty of other parking spaces closer to the door that he could have parked at." (Id.). Caldwell notified John Lewis that Christian was staring at her again and moving his car beside hers, making her uncomfortable. (Id. at p. 52). Lewis said he would tell Payne Roberts. (Id.). Caldwell never heard anything from Payne until April 2017 when she first told Mediacom that she was quitting, leading her to believe that Lewis never reported her complaints to management. (Id. at p. 53). Mediacom claims that it attempted to verify Caldwell's complaints that Christian was moving his vehicle next to hers but found no evidence to support her allegations. (Hudson Dep., p. 82-83; Long Dep., p. 128; Doc. 38-1, p. 61).

Caldwell believed Christian was stalking her. (Caldwell Dep., p. 106). She started missing work, causing her to receive warnings for absenteeism. (Id. at p. 90). When asked to explain her attendance issues, Caldwell replied, "I would get physically sick to my stomach every morning, scared something was going to happen when I went to work, so I wouldn't go." (Id. at p. 92). She called in sick to work but never directly connected her absence to Christian. (Id.).

On April 10, 2017, Caldwell met with Payne Roberts. (Id. at p. 54). Caldwell told Roberts that she was resigning from Mediacom because she no longer felt comfortable working there. (Id.; Doc. 38-1, p. 49). She informed

Roberts that Christian was continuing to park beside her in the parking lot and that she was having her mother-in-law or husband meet her in the parking lot after work to follow her home. (Caldwell Dep., p. 188; Doc. 38-1, p. 49, 86). Roberts denied knowing that Caldwell was still having trouble with Christian. (Caldwell Dep., p. 54). She asked Caldwell to give her time to talk to someone in human resources. (Id.). Caldwell was under the impression that Roberts was going to set up a meeting with human resources. (Id. at p. 58). She then packed her belongings and left the call center. (Id. at p. 59; Doc. 38-1, p. 49, 87). In documenting these events, Carla Long sent an email to Sonja Hudson indicating there was a rumor Caldwell was seeking legal advice. (Doc. 38-1, p. 87).

The following day, Caldwell returned to Mediacom to meet with Roberts and Long. (Doc. 38-1, p. 49). Caldwell again reported that she felt uneasy leaving at the end of her shift because Christian was parking next to her. (Id.). Mediacom noted that Christian's shift ended thirty minutes after Caldwell's. (Id.). But Caldwell testified that Christian often left early, and on Saturdays their shifts ended at the same time. (Caldwell Dep., p. 162). Mediacom assured Caldwell that they would investigate her allegations. (Id. at p. 59). Mediacom also told her that a supervisor would walk her to her car. (Id.). That never happened. (Id. at p. 59-60). Caldwell believed that she did not need to ask a supervisor to accompany her to her car, that it was just supposed to happen. (Id. at p. 60). She

was told not to ask because "it would make it known what was going on. They didn't want anybody to know what was going on." (Id.).

Caldwell returned to work with the understanding that she would be moved to a seat out of Christian's view and that a supervisor would walk her to her car each night. (Id. at p. 62). Caldwell testified that the staring did not stop: "I still noticed him staring, but it made it harder for him to just stare constantly where I [was] seated. Every time I stood up, he stood up and watched where I went." (Id. at p. 63). Christian never said anything; he just stared. (Id. at p. 106). Then, one day as she was walking toward her car, she noticed Christian parked in front of her. (Id.). As she approached, Christian exited his vehicle and began walking toward her. (Id.). Caldwell said that Christian smiled and looked as though he was about to say something until Caldwell's husband appeared. (Id. at p. 63-64). Christian then returned to his car. (Id. at p. 63).

Caldwell told John Lewis and Payne Roberts about the incident, but Mediacom took no action. (Id. at p. 66, 68). So, on April 20, 2017, she e-mailed Italia Commisso at the corporate office. (Id. at p. 66, 68-69). She told Commisso that she did not feel like Mediacom was doing anything to make her feel safe at work. (Id. at p. 69). Commisso never responded. (Id.). That same day, Caldwell told John Lewis that she was not coming back to work. (Id. at p. 74-75). Caldwell attempted to resign again on April 21, 2017. (Id. at p. 74). She did not want to

28

leave her job, but she did not feel safe at work. (Id. at p. 208). Caldwell explained to Payne Roberts that if Mediacom could not make her feel comfortable at work, she would not return. (Id. at p. 74, 76). Roberts asked how Mediacom could make her feel more comfortable. (Id. at p. 76). Caldwell responded, "I told her they could move me to an area [where] [Christian] couldn't see me, they could change my hours and make it to where I didn't come in at all when he was there. I told her that supervisors weren't walking me out to the parking lot at night, which didn't help me feeling safe at work." (Id.). Roberts replied that she would reach out to Mediacom's human resources department. (Id.).

Caldwell stopped reporting to work. (Id. at p. 75). Mediacom's only response to her continued complaints about Christian was to move her seat, which she found inadequate. (Id. at p. 69). Mediacom never provided Caldwell "an option to say where [she] wanted to move. [She] was just told that they would find a new seat for [her]." (Id. at p. 118). She felt "like [she] was the one getting in trouble for something that he was doing. And it continued to happen." (Id.). All Mediacom told her was that they would speak with Christian. (Id. at p. 70). Mediacom "made [her] feel as if it was [her] fault." (Id. at p. 134).

Payne Roberts e-mailed Caldwell on April 24, 2017 to ask whether she was okay. (Doc. 38-1, p. 64; Doc. 41-1, p. 47). Caldwell responded on April 25, saying that she would return to work the next day if Mediacom agreed to change

her schedule and seating assignment to limit her contact with Christian. (Caldwell Dep., p. 93, 167). Caldwell expected a follow-up telephone call from Mediacom. (Id. at p. 167). She heard nothing further until May 2, 2017, when she received a certified letter from Mediacom inviting her to meet with Mediacom's investigators. (Id. at p. 167-68; Doc. 41-1, p. 45). Caldwell met with the investigator on May 3, 2017. (Caldwell Dep., p. 169). Then, on May 9, 2017, Carla Long contacted Caldwell to confirm her resignation. (Id. at p. 170). There was some discussion then about Caldwell returning to Mediacom, provided her hours were adjusted to ensure she left work before Christian arrived and her seat relocated to a position where he could not see her. (Id.). When the conversation ended, Caldwell understood that Long would call her back with her new work hours. (Id. at p. 100). Caldwell waited for a phone call that never came. (Id. at p. 99). On May 26, 2017, Mediacom issued Caldwell a termination notice for job abandonment. (Doc. 41-1, p. 13-14; Doc. 41-1, p. 24).

Caldwell testified that she continues to feel the effects of her experience with Christian: "I can't even leave my house without worrying if [Christian] is going to show up somewhere or if he's going to see me and follow me. I have anxiety all the time, nightmares. I still get sick from the whole situation." (Caldwell Dep., p. 174).

## May 2017 Investigation and EEOC Charge of Discrimination

In May 2017, nearly seven months after Crystal Vinson first complained of Marcus Christian's harassing conduct, Mediacom launched a formal investigation. The investigation was conducted by two Mediacom employees, Dan Wolfe, the Director of Human Resources in Mediacom's Minnesota office, and Jennifer Zaniecki, a member of Mediacom's corporate human resources team. (Hudson Dep., p. 125; Long Dep., p. 146). The investigators met with more than forty Mediacom employees, many of whom reported hearing or knowing something about the allegations made by Crystal Vinson, Heather Vaughn, and Breanna Caldwell. (Doc. 38-1, p. 34-43). Several employees interviewed provided first-hand accounts of what they observed. Tina Lale described Christian as a "creepy guy" and reported that he was known to "stare[ ] at the white girls in the call center." (Id. at p. 31). Franklin Jones said that he personally witnessed Christian standing up and staring at Vaughn and Caldwell. (Id. at p. 29). He also remarked to the investigators generally that women in the office were uncomfortable with Christian. (Id.). Shannon Brooks told the investigators that she witnessed Christian staring at Caldwell and moving his car to park next to Caldwell. (Id. at p. 42).

Three other female customer service representatives provided the investigators written statements. Michayla Shaw stated that she witnessed

Christian staring at both Vaughn and Vinson. (Doc. 38-1, p. 22). She also wrote that she witnessed Christian moving his car next to Vaughn's where he then would sit and watch Vaugh. (Id.). Shaw expressed her concern for Vaughn's safety. (Id.). Brittney Baker also personally witnessed Christian staring at and following Vaughn. (Id. at p. 23). Baker said that she did not report her observations earlier because Vaughn already notified a supervisor. (Id.). Adriane Thomas confirmed that she, too, witnessed Christian moving his car beside Vaughn and staring at her. (Id. at p. 24). Thomas told Vaughn "that she didn't need to go out by herself because she felt [Christian] was crazy." (Id.). She also told John Lewis that he needed to walk Vaughn to her car to ensure her safety, but he never did. (Id.).

Ultimately, Mediacom declared the investigation inconclusive. (Long Dep., p. 256). Sonja Hudson, Carla Long, and Donna Watkins met with Heather Vaughn on May 18, 2017 to discuss the results of the investigation. (Long Dep., p. 251-52; Vaughn Dep., p. 80; Doc. 39-1, p. 61). Mediacom informed her that cameras were being installed both inside and outside the call center. (Long Dep., p. 251; Doc. 39-1, p. 61). Vaughn expressed concern that Mediacom was taking no additional measures. (Doc. 39-1, p. 61). According to Vaughn, Mediacom instructed her not to "speak on the issue with any new employees because there is no reason for them to know about the issue" and to "put this issue to bed."

(Vaughn Dep., p. 80). Vaughn felt like the situation was not handled properly, and she "just want[ed] to bury it down." (Id. at p. 105).

Hudson, Long, and Watkins did not meet with Crystal Vinson until June 19, 2017. (Hudson Dep., p. 150). Mediacom informed Vinson that the investigation had concluded and that, without witnesses or allegations of touching, they were left with a he said she said situation. (Id. at p. 151). Mediacom further told her that the matter would be addressed with Marcus Christian and directed her to report if anything else happens. (Id.). Mediacom also informed Vinson that cameras would be installed. (Id. at p. 152).

On June 28, 2017, Tina Lale submitted a termination request for Crystal Vinson for absenteeism. (Lale Dep., p. 118; Doc. 38-1, p. 76). On four different dates between May 3, 2017 and June 28, 2017, Vinson left work two hours early and did not have sufficient accrued leave to cover the absence. (Doc. 35-1, p. 19). Vinson testified that on each of those occasions she left the call center before Christian arrived at work. (Vinson Dep., p. 135). The first time she left early, she told Tina Lale that she was leaving before Christian's shift started. (Id. at p. 136). After that, she thought Lale understood why she left early and did not think her early departure required additional explanation. (Id.). Vinson resigned from Mediacom on July 17, 2017. (Doc. 35-1, p. 17). She told Mediacom that she was resigning for personal reasons. (Vinson Dep., p. 128). She "told them that so

[she] could leave, so [she] didn't have to explain everything that already happened that they didn't do anything about." (Id.). Vinson resigned because Christian continued to work for Mediacom, and she no longer felt comfortable working there. (Id. at p. 129).

Crystal Vinson and Breanna Caldwell each filed a charge of discrimination with the EEOC on June 15, 2017. (Doc. 35-1, p. 31-32; Doc. 41-1, p. 43-44). Both women alleged that they had been subjected to sexual harassment and retaliation while employed by Mediacom. (Id.). The EEOC investigated Plaintiffs' allegations and concluded that the evidence supported Plaintiffs' claims of sexual harassment, retaliation, and constructive discharge:

> Based upon the evidence, there is reasonable cause to conclude that [Vinson], and female employees, as a class, were subjected to unlawful sexual harassment in violation of Title VII. There is also reasonable cause to conclude that [Vinson] was retaliated against after making protected complaints and was constructively discharged due to [Mediacom's] failure to address her complaints, also in violation of Title VII.

(Doc. 63-46, p. 11).

## II.   SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Not all factual disputes render summary judgment

inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). But, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In reviewing a motion for summary judgment, the "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (citations omitted) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. (internal quotation marks and citation omitted). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets

this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and to present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 323.

## III.   ANALYSIS

### A.   Hostile Work Environment Claim

Crystal Vinson, Heather Vaughn, and Breanna Caldwell allege that Marcus Christian subjected them to unwanted physical contact and acts of intimidation. They contend his conduct created a hostile work environment. Plaintiffs claim that Christian visually pursued them throughout their shifts and that he followed them to the parking lot. Despite numerous reports to Mediacom about this allegedly harassing conduct, Mediacom's only response was to change Vinson, Vaughn, and Caldwell's schedules and seat assignments. Christian's conduct persisted. Viewing the evidence presented in the light most favorable to Plaintiffs, the Court finds that there is sufficient evidence from which a reasonable jury could determine that Christian's conduct created a hostile working environment and "exposed [Plaintiffs] to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." Oncale v. Sundowner

Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). While Title VII does not explicitly mention sexual harassment, the Supreme Court has long recognized that the "phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris, 510 U.S. at 21 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)) (other internal quotation marks and citations omitted). A violation of Title VII arises when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (internal quotation marks and citation omitted).

To prove a prima facie case for a hostile work environment based on sexual harassment, a plaintiff must show,

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment [was] based on the sex

of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)). "Workplace conduct is not measured in isolation." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001). Rather, evidence of harassment shall be "considered both cumulatively and in the totality of the circumstances." Reeves, 594 F.3d at 808.

Mediacom does not contest that Plaintiffs satisfy the first two elements of the prima facie case. However, Mediacom argues that it is entitled to summary judgment because Plaintiffs cannot establish that (1) the harassment was based on their sex; (2) the harassment was sufficiently severe or pervasive; or (3) there is a basis to hold Mediacom liable.

### 1. Unwelcome Harassment Based on Sex

Mediacom asserts that neither Vaughn nor Caldwell has presented evidence that Christian's alleged conduct was based on their sex and, therefore, that Mediacom is entitled to summary judgment on Vaughn and Caldwell's hostile work environment claim.[7] The Eleventh Circuit has long recognized that a plaintiff

---

[7] Mediacom does not contest that Vinson's allegations support a finding that the harassment she suffered was based on her sex.

can establish that harassment was "based on her sex" by showing "that but for the fact of her sex, she would not have been the object of harassment." Mendoza, 195 F.3d at 1248 n.5 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). The "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale, 523 U.S. at 80. The "crucial inquiry is whether the harasser treats a member or members of one sex differently from members of another sex." McCoy v. Macon Water Auth., 966 F. Supp. 1209, 1216 (M.D. Ga. 1997) (quoting EEOC Compliance Manual, § 615.2(b)(3)).

Vaughn and Caldwell have produced sufficient evidence from which a reasonable jury could find that Christian directed his attention toward them because they are women. Staring and following, as these two Plaintiffs have alleged, without more may be characterized as gender neutral. See Mendoza, 195 F.3d at 1248 ("[A]lthough 'following and staring' can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees."). But there is no evidence that Christian stared at, followed, or in any way engaged with any men in Mediacom's call center in the manner alleged by Plaintiffs. There is, however, evidence that Christian was known to stare specifically at women and that

Christian made women in the call center uncomfortable. (Lale Dep., p. 102; Vinson Dep., p. 170-71; Doc. 38-1, p. 29, 31). Based on this evidence, a jury could find that Christian targeted Vaughn and Caldwell because they are women.

### 2.  Sufficiently Severe or Pervasive

Mediacom next argues that Plaintiffs' allegations of isolated touching and physical contact, a few stray remarks, staring, and vehicle relocation by Christian do not rise to the level of severe or pervasive harassment. Were the Court to view each Plaintiffs' accusations individually, Mediacom's argument may have merit. However, the law directs the Court to "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the [Plaintiffs'] employment and create a hostile or abusive working environment." Mendoza, 195 F.3d at 1246 (citation omitted).

Title VII does not serve as a "general civility code." See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Accordingly, "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale, 523 U.S. at 81. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (internal quotation marks and citations

omitted). To be actionable, "a hostile work environment must be both objectively and subjectively offensive." Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1247 (11th Cir. 2004) (internal quotation marks and citations omitted). This means that a reasonable person would find the environment hostile and abusive and that the victim perceived to be so. Id.

The Court first must determine whether Plaintiffs subjectively perceived the harassment to be severe or pervasive. Reeves, 594 F.3d at 809 ("Either severity *or* pervasiveness is sufficient to establish a violation of Title VII.") (emphasis in original). To be actionable under Title VII, the victim must actually perceive that the work environment was hostile. Hulsey, 367 F.3d at 1247. "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." Harris, 510 U.S. at 22.

Plaintiffs have sufficiently demonstrated their subjective perception of a hostile work environment. Crystal Vinson was so distressed by Christian's constant touching through the back of her chair and his attempt to force her to touch his exposed penis, and so frustrated with Mediacom's lack of response to her allegations of harassment, that she reached out to Italia Commisso, Mediacom's highest ranking human resources officer. (Vinson Dep., p. 84-85; Doc. 35-1, p. 8). She expressed to Commisso that she "just want[ed] to feel

comfortable again." (Doc. 35-1, p. 8). Vinson continued reporting Christian's harassing conduct, including him rubbing his arm against the back of her chair as he passed by her to consult with a supervisor, touching her breast in the hallway, and staring at her daily. (Vinson Dep., p. 90-91, 100-05, 159). She tried to hide from Christian in her cubicle. (Id. at p. 104). Toward the end of her employment with Mediacom, Vinson began leaving work before the end of her shift to avoid having any contact with Christian. (Id. at p. 135). Vinson testified that the harassment she experienced caused her to become emotionally and sexually detached from her husband, which ultimately played a role in their divorce. (Id. at p. 192-93). She continues to struggle with the emotional distress caused by Christian's harassment. (Id. at p. 196).

Within the first several days of noticing Christian staring at her, Heather Vaughn reported to her supervisor John Lewis that Christian's staring made her feel uncomfortable. (Vaughn Dep., p. 24-25). Vaughn described Christian's staring as intentional and aggressive. (Id. at p. 34). She said that he looked at her "like an animal looks at prey." (Id. at p. 112). The staring was so constant and intense that "it would take [her] over an hour after [she] had gotten off of work to feel like he wasn't still staring at [her]." (Id. at p. 27). Vaughn's discomfort grew after discovering that Christian was moving his vehicle next to hers. (Id. at p. 40-41). The level of stress and unease she felt while working with Christian reached

such a level that when Christian made an otherwise innocuous comment about her shirt, Vaughn burst into tears and ended up taking unpaid leave for the remainder of the day. (Id. at p. 79, 116). Vaughn further testified that she modified her own conduct when she knew Christian was working and would not wear dresses or skirts those days. (Id. at p. 44). The only days she felt comfortable at work were the days Christian was not in the call center. (Id.). It was not until Christian resigned from Mediacom in March 2019 that Vaughn finally felt a weight lifted off her shoulders. (Id. at p. 105).

Breanna Caldwell similarly perceived Christian's constant staring as harassing. In March 2017, Caldwell noticed Christian staring at her "in an odd manner" and "standing up every time [she] stood up," making her feel uncomfortable. (Caldwell Dep., p. 37). As soon as she realized that the staring was intentional and not coincidental, Caldwell reported her discomfort. (Id. at p. 37, 45). Caldwell testified that Christian's staring was "more than just innocent looking around" or "looking in [her] direction," and she "knew it wasn't in a friendly manner." (Id. at p. 107). She reported Christian's conduct to Love Fernandez and John Lewis. (Id. at p. 46, 48, 52; Doc. 38-1, p. 85). Christian continued to stand up or move his chair to position himself to watch Caldwell. (Id. at p. 40, 49). One day he watched her until she finished a call and then followed her outside the call center. (Id. at p. 89). Caldwell did not feel safe. (Id.). Caldwell's discomfort

increased when she noticed Christian parking his car beside hers. (Id. at p. 49). Caldwell believed Christian was stalking her. (Id. at p. 106). Her husband and mother-in-law began meeting her in the parking lot to follow her home. (Caldwell Dep., p. 188; Doc. 38-1, p. 49, 86). She missed work because she "would get physically sick to [her] stomach every morning, scared something was going to happen when [she] went to work." (Id. at p. 92).

At least five other Mediacom employees corroborated the harassing conduct alleged by Vinson, Vaughn, and Caldwell. Franklin Jones told the Mediacom investigators that he personally witnessed Christian standing up and staring at both Vaughn and Caldwell. (Doc. 38-1, p. 31). Shannon Brooks supported Caldwell's claim that Christian was staring at her and moving his car to park next to Caldwell's. (Id. at p. 42). Similarly, Michayla Shaw provided a written statement that she witnessed Christian staring at Vinson and Vaughn. (Doc. 38-1, p. 22). Shaw additionally expressed concern for Vaughn's safety. (Id.). Both Brittney Baker and Adriane Thomas observed Christian staring at and following Vaughn. (Id. at p. 23-34).

The Court next must evaluate whether that perception is objectively reasonable. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale, 523 U.S. at 81 (quotation marks and citation omitted). In

assessing the objective severity and pervasiveness of the harassment, courts typically consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." Hulsey, 367 F.3d at 1247-48 (citing Faragher, 524 U.S. at 787-88). A plaintiff need not produce proof of each individual factor; instead, the court should consider the totality of the circumstances. See id. at 1248 (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002)). For, as the Supreme Court observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 81-82. "Context matters." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 63, 69 (2006).

Considering the totality of the circumstances in the light most favorable to Plaintiffs, Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether Christian's conduct was objectively severe or pervasive to alter the terms or conditions of Plaintiffs' employment. There is ample evidence of the frequency of Christian's harassment. In the week and a half preceding Christian exposing his genitalia to Vinson, he touched Vinson's

bottom through the back of her chair three to five times. (Vinson Dep., p. 53-54).

Even after Mediacom relocated Vinson's workstation following the exposure incident, Christian continued to intentionally touch her in some fashion each time he passed by her. (Id. at p. 90-91). He also stared at Vinson daily. (Id. at p. 104). Vaughn and Caldwell likewise testified that Christian stared at them regularly. (Caldwell Dep., p. 37, 49, 63; Vaughn Dep., p. 37, 41; Doc. 38-1, p. 20).[8] In addition to staring, Vaughn testified that Christian followed her to the parking lot on at least five occasions and frequently moved his vehicle next to hers in the parking lot. (Vaughn Dep., p. 40, 85, 103). Caldwell observed Christian moving his car next to or near hers on multiple days as well. (Caldwell Dep., p. 49, 49-50; Doc. 38-1, p. 49).

There is additional evidence from which a reasonable jury could conclude that Christian's conduct was both severe and physically threatening or humiliating. Vinson testified that Christian forcibly tried to make her touch his exposed penis. (Vinson Dep., 61-62). Two months later, he intentionally walked into Vinson and grabbed her breast. (Id. at p. 100-02). A reasonable employee in

---

[8] Mediacom questions Plaintiffs' testimony regarding the frequency of Christian's staring, stating that it would be impossible for Christian to stare at all three women. (Doc. 85, p. 4). Mediacom's argument fails to account for Plaintiffs' differing work schedules. Nevertheless, any challenge to the veracity of Plaintiffs' testimony requires a credibility termination, which lies in the province of a jury. See Reeves, 530 U.S. at 150.

Vinson's position, who had experienced prior touching episodes and frequent staring could find this behavior both severe and physically threatening.

The severity of the staring experienced by all three women, coupled with Christian moving his car and, in the case of Vaughn following her to her car, also far exceeds the type of staring described in <u>Mendoza</u> and rises to a level where it could objectively be considered both severe and physically threatening. In <u>Mendoza</u>, the Eleventh Circuit found that the plaintiff's allegations that her supervisor was staring at her and following her at work were not actionable in part because the plaintiff "did not describe the following as walking close behind her in an intimidating or threatening fashion, but instead simply as [her supervisor] showing up when [she] happened to be in the hallways, in the lunch room, or at the picnic table outside." 195 F.3d at 1250. The <u>Mendoza</u> plaintiff also never described the following or staring "as 'stalking' or 'leering' or 'intimidating' or 'threatening.'" <u>Id.</u> The same cannot be said in this case. Here, Plaintiffs' have provided clear evidence from which a jury could find that Christian's staring and following was personally directed at each woman and that his conduct was both intimidating and threatening. (Caldwell Dep., p. 37, 40, 45-46, 48-49, 50, 63, 92, 106-07; Vaughn Dep., p. 25-27, 33-34, 40-41, 89, 112; Vinson Dep., p. 84, 90, 92, 105-05; Doc. 35-1, p. 8; Doc. 38-1, p. 20, 22-23, 29, 42, 81, 85).

Finally, a reasonable jury could find based on the evidence that Christian's conduct interfered with Plaintiffs' job performance. Vinson testified that after Christian commented about her wearing a skirt in exchange for working a pay-per-view event for her that she stopped engaging in any conversation with him. (Vinson Dep., p. 52, 165). When he then began touching her through her chair, she regularly had to pause work to tell him to stop. (Id. at p. 55). Following the exposure incident, Vinson was sent home from work early. (Hudson Dep., p. 50; Vinson Aff., ¶ 10). Vinson further testified that she tried to hide in her cubicle to escape Christian's staring. (Vinson Dep., p. 104). And, toward the end of her employment at Mediacom, Vinson started leaving her shift early to avoid Christian. (Id. at p. 135). Vaughn and Caldwell also missed work in response to Christian's harassing behavior. (Caldwell Dep., p. 90, 92; Vaughn Dep., p. 79, 116). Vaughn testified that she modified the way she dressed at work because of Christian. (Vaughn Dep., p. 44). Mediacom relocated all three Plaintiffs' workstations multiple times and altered their work schedules in response to their continued complaints of harassment. (Caldwell Dep., p. 48, 62; Roberts Dep., p. 89; Vaughn Dep., p. 41, 47; Vinson Dep., p. 66, 88; Doc. 38-1, p. 69, 85)

Considering the totality of the circumstances, the Court concludes that there is sufficient evidence from which a reasonable jury could find that the harassing conduct described by Plaintiffs was both subjectively and objectively

severe or pervasive. The Court accordingly finds that Plaintiffs have satisfied this element of their prima facie case.

### 3.    Basis for Liability

Mediacom argues that it is not liable for any purported work-place harassment because the company adequately responded to Plaintiffs' complaints. But whether Mediacom took appropriate and prompt remedial action to prevent the continued harassment alleged by Plaintiffs is a question for a jury. "Under Title VII, an employer's liability for such harassment may depend on the status of the harasser." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). Where, as here, "the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Id. An employer's "combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." Faragher, 524 U.S. at 789 (citation omitted).

The parties do not dispute that Mediacom was aware of Plaintiffs' allegations of harassment. However, there is a genuine issue of material fact as to whether Mediacom took prompt remedial action to end the harassment. Plaintiffs each testified that when they made their initial reports of Christian's misconduct, Mediacom took no immediate action against Christian, and his

unwanted behavior continued. (Caldwell Dep., p. 47-48; Vaughn Dep., p. 36; Vinson Dep., p. 54-55, 168-69). Even after Caldwell informed Mediacom that Christian exposed his penis to her in October 2016, Mediacom's only response was to meet with Vinson and Christian individually and then declare the situation a "he said she said" scenario. (Hudson Dep., p. 50-51; Long Dep., p. 69; Vinson Dep. p. 77-78). Christian testified that during his meeting with Mediacom he was asked "[w]hat's going on between you and [Vinson]" and whether he exposed himself. (Christian Dep., p. 61). Mediacom never directly asked Christian if he exposed his penis to Vinson, and Christian had to interpret what he was being asked. (Id.).

When Vinson continued to report Christian's harassing conduct, and when Mediacom began receiving similar complaints of constant staring and following, Mediacom adopted a uniform response: move the complaining woman to a different workstation. Relocating Plaintiffs did not curtail Christian's conduct. (Caldwell Dep., p. 49, 63, 118; Roberts Dep., p. 87, 89; Vaughn Dep., p. 41, 47; Vinson Dep., p. 81, 84; Doc. 38-1, p. 60). Plaintiffs felt they were being punished for Christian's wrongdoing. (Caldwell Dep., p. 118, 134; Vaughn Dep., p. 59-60; Vinson Dep., p. 85). Sonja Hudson admits that changing the women's seat assignments was not the proper response. (Hudson Dep., p. 70).

Furthermore, after Mediacom met with Christian to address the exposure incident, there is evidence suggesting that Mediacom took no action against him. (Christian Dep., p. 97). Mediacom also never discussed with Christian Plaintiffs' later claims that he was staring at them, following them, and moving his car closer to theirs. Christian testified that he was not aware of any of Vaughn's claims until the EEOC investigator arrived in 2018. (Christian Dep, p. 80). He denies Mediacom ever discussing Vaughn's claims with him. (Id. at p. 81).

Mediacom did order a formal investigation of Plaintiffs' claims of harassment until almost seven months after Vinson's exposure allegation, five months after Vaughn's first complaint that Christian was staring at her, and two months after Caldwell's initial staring allegation. Even after the investigation revealed that at least five Mediacom employees substantiated Plaintiffs' claims, Mediacom determined that the investigation was inconclusive. (Long Dep., p. 256). Other than informing Plaintiffs that new surveillance cameras would be installed, Mediacom took no further measures to address Plaintiffs' continuing concerns. (Hudson Dep., p. 150-52; Long Dep., p. 251; Doc. 39-1, p. 61).

There is some evidence that Mediacom responded to Plaintiffs' allegations of harassment. However, the timing and sufficiency of that response presents a question of fact that must be resolved by jury. Therefore, summary judgment is not proper.

51

### B.    Plaintiff-Intervenors' Individual Claims

### 1.    Constructive Discharge

Mediacom argues that it is entitled to summary judgment on Plaintiff-Intervenor Crystal Vinson's constructive discharge claim for three reasons. First, Mediacom contends that Vinson failed to administratively exhaust her constructive discharge claim. Second, Mediacom asserts that because Vinson cannot establish a viable hostile work environment claim, by extension she cannot maintain a claim for constructive discharge. Finally, Mediacom challenges Vinson's constructive discharge claim on the basis that she did not provide Mediacom with sufficient time to remedy the allegedly intolerable working conditions leading to her resignation.

### a.    Administrative Exhaustion

As a condition precedent to filing a lawsuit under Title VII, an aggrieved employee first must exhaust her administrative remedies by filing a timely charge of discrimination with the EEOC. See 42 U.S.C. § 2000e-5; Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). "The filing of a charge of discrimination marks the beginning of a regulatory scheme involving an integrated, multi-step enforcement procedure that enables the EEOC to detect and remedy various discriminatory practices." Giles v. BellSouth Telecomms., Inc., 542 F. App'x 756, 758 (11th Cir. 2013) (citing E.E.O.C. v. Shell Oil Co., 466

U.S. 54, 62 (1984); Bost v. Fed. Express Corp., 372 F.3d 1233, 1238 (11th Cir. 2004)) (internal quotation marks omitted). The exhaustion requirement is intended to provide the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 929 (11th Cir. 1983).

"The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation. Alexander v. Fulton Cnty., 207 F.3d 1303, 1332 (11th Cir. 2000). "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. (internal quotation marks and citation omitted). However, courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." Sanchez v. Standard Brands, Inc., 431 F.2d 455, 460-61 (5th Cir. 1970). [9] The scope of an EEOC charge of discrimination, therefore, "should not be strictly interpreted." Id. at 465 (citation omitted). Rather, the proper inquiry is whether the plaintiff's complaint "was like or related to, or grew out of, the allegations contained in her EEOC charge." Gregory v. Ga. Dep't of Hum. Res.,

---

[9] Fifth Circuit decisions issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

355 F.3d 1277, 1280 (11th Cir. 2004); see also Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989) ("Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO[C] complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate.") (citation omitted).

Vinson filed her charge of discrimination with the EEOC on June 15, 2017, several weeks before her July 17, 2017 resignation from Mediacom. (Doc. 35-1, p. 17, 31-32). In her charge, Vinson stated that Mediacom discriminated and retaliated against her based on her sex. (Id. at p. 31-32). The charge does not specifically mention constructive discharge. (Id.). However, on September 7, 2017, Vinson's attorney provided an extensive position statement to the EEOC investigator that includes allegations of constructive discharge. (Doc. 63-46, p. 5-9). Furthermore, it is apparent from the agency's determination notice that the EEOC investigated Vinson's constructive discharge claim: "There is also reasonable cause to conclude that [Vinson] was retaliated against after making protected complaints and was constructively discharged due to [Mediacom's] failure to address her complaints, also in violation of Title VII." (Id. at p. 11). Because the evidence shows that Vinson's constructive discharge claim is related to the allegations contained in her charge of discrimination, and that the

EEOC investigated the claim, Mediacom's motion for summary judgment on the basis of administrative exhaustion lacks merit and is denied.

### b.    Evidence of Adverse Working Conditions

Mediacom next argues that it is entitled to summary judgment on Vinson's constructive discharge claim because Vinson has not presented sufficient evidence to maintain her hostile work environment claim, which requires a less stringent burden of proof. "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir. 1982) (internal quotation marks and citation omitted). "The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." Young v. Sw. Sav. and Loan Ass'n, 509 F.2d 140, 144 (5th Cir. 1975). The burden of proving a constructive discharge claim under Title VII is high. Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim."). The plaintiff must

show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Id. (internal quotation marks and citation omitted); see also Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir.1997)

The Court has already determined that Vinson produced evidence from which a reasonable jury could conclude that she was subjected to a hostile work environment while employed by Mediacom. See supra. Whether or not those same conditions "were so unbearable that a reasonable person in [Vinson's] position would be compelled to resign" is a question for the jury. Bryant, 575 F.3d at 1298.

### c.    Notice to Mediacom

Mediacom contends that Vinson's constructive discharge claim fails because she resigned before Mediacom had the opportunity to address her concerns. "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Bryant, 575 F.3d at 1299 ("An employer may defend against [a constructive discharge claim] by showing . . . that the plaintiff unreasonably failed to avail herself of [the] employer-provided preventive or remedial apparatus.") (internal quotation marks and citation omitted). Included within "an employee's obligation to be *reasonable* is an

obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1538 (11th Cir. 1987) (emphasis in original); see also Mathews v. City of Gulfport, 72 F. Supp. 2d. 1328, 1338 (M.D. Fla. 1999) ("[A]n employee has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge.").

In Kilgore, the Eleventh Circuit affirmed summary judgment where the plaintiffs, after notifying their employer of the alleged sexual harassment, did not return to work the following week and would not meet with investigators. 93 F.3d at 754. The Court found that the plaintiffs could not prove their constructive discharge claim because they did not allow the employer sufficient time to correct the situation. Id. Similarly, in Odom v. Fred's Stores of Tenn., Inc., Case No. 7:12-CV-91 (HL), 2013 WL 6498499, at *11 (M.D. Ga. Dec. 11, 2013), on which Mediacom relies, this Court found that the plaintiff's constructive discharge claim failed because it was unreasonable for her to wait until after she resigned to report allegations of harassment to her employer.

The facts here are distinguishable. Vinson first notified Mediacom that she was uncomfortable with Christian touching her sometime around September 2016. (Vinson Dep., p. 52-55). Mediacom neither responded nor investigated these allegations. (Id. at p. 55, 188). Vinson reported Christian again in October

2016 after he exposed his penis to her. (Id. at p. 60-63). Mediacom's of that claim consisted solely of interviewing Vinson and Christian. (Hudson Dep., p. 50-51; Long Dep., p. 69; Vinson Dep. p. 77-78). Vinson continued reporting Christian's harassing conduct. (Vinson Dep., p. 90-94, 100-04; Doc. 38-1, p. 60).

Mediacom did not formally investigate Vinson's claims of harassment until May 2017, many months after Vinson's original reports that Christian's conduct made her uncomfortable. Mediacom then waited until the middle of June 2017 to discuss the outcome of the investigation with Vinson. (Hudson Dep., p. 150). By that time, Vinson was so distressed at work that she regularly left the call center early to avoid being there with Christian. (Vinson Dep., p. 135; Doc. 35-1, p. 19). While Mediacom claims that Vinson did not inform the company that she was leaving for this reason, Vinson testified that she told supervisor Tina Lale that she was leaving before Christian's shift started. (Id. at p. 136). Vinson soon quit, citing personal reasons. (Id. at p. 128).

Mediacom argues that Vinson cannot maintain her constructive discharge claim because she acted unreasonably by not informing Mediacom that her absences and resignation related to Christian and by not giving Mediacom time to remedy the situation. The Court finds this argument unpersuasive. Nearly nine months passed between the time Vinson first reported Christian's inappropriate conduct and her resignation. She made numerous subsequent complaints. Still,

the harassment continued. Based on this evidence, a reasonable jury could find that Vinson provided Mediacom with ample time to address her repeated complaints of harassment before she resigned from Mediacom. Therefore, Mediacom is not entitled to summary judgment on Vinson's constructive discharge claim.

###    2.    Retaliation

Whether or not Vinson and Caldwell can proceed with their retaliation claims requires resolving several questions of material fact. "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). To prove an adverse employment action, the plaintiff "must show a serious and material change in the terms, conditions, or privileges of employment" that is "materially adverse as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted). "[T]he action must either be an ultimate employment decision or else must meet some threshold level of substantiality." Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004) (internal quotation and

citation omitted). "Constructive discharge qualifies as an adverse employment decision." Poole, 129 F.3d at 553 n.2.

Once the plaintiff establishes her prima facie case, the employer then "may come forward with legitimate reasons for the employment action to negate the inference of retaliation." Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). The burden is "exceedingly light." Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988). If the employer points to "legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1310-11 (11th Cir. 2016). The plaintiff is entitled to survive summary judgment "only if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." Id. at 1313.

Mediacom argues that neither Vinson nor Caldwell can establish a prima facie case of retaliation. According to Mediacom, Vinson and Caldwell's claims fail, in part, because they cannot establish that their allegations that Christian stared at them, followed them, and moved his car next to theirs constituted a statutorily protected activity. This argument relies on Mediacom's continued position that the conduct alleged by Vinson and Caldwell does not rise to the

level of actionable sexual harassment. Mediacom further contests that Vinson and Caldwell were subject to an adverse employment action.[10] Specifically, Mediacom argues that because there is no evidence of constructive discharge, Vinson cannot satisfy this element of her claim. Mediacom also asserts that Vinson and Caldwell cannot establish a causal connection between their complaints of harassment and any materially adverse employment action.

As the Court has explained, Mediacom's arguments concerning whether Plaintiffs have presented evidence of actionable sexual harassment and whether Vinson can maintain a claim for constructive discharge raise issues of fact that must be resolved by a jury. Whether or not Plaintiffs can establish a causal connection between the alleged harassment and the end of their employment likewise must be determined by a finder of fact. Accordingly, the Court cannot conclude as a matter of law that Vinson and Caldwell have satisfied their burden of establishing a prima facie case of retaliation. Mediacom's motion for summary judgment as to Vinson and Caldwell's retaliation claim, therefore, is denied.

---

[10] Vinson alleges that she suffered an adverse employment action when Mediacom constructively discharged her and when Mediacom denied her a raise. (Vinson Dep., p. 144). Whether or not Vinson was constructively discharged raises questions of fact that must be resolved by a jury. However, the Court finds that there is insufficient evidence in the record to sustain Vinson's claim that Mediacom denied her a raise in retaliation for reporting Christian's harassing behavior. Accordingly, the Court **GRANTS** Mediacom's motion for summary judgment on Vinson's retaliation claim based on the denial of a raise.

## IV.      CONCLUSION

For the reasons discussed herein, the Court **DENIES** Defendant Mediacom Communications Corporation's Motion for Summary Judgment (Doc. 30). This case will be placed on the Court's next available trial calendar.

**SO ORDERED**, this the 16th day of March, 2021.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**


aks

62